*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

RAMONYEA TRAVON BISHOP,

      Defendant-Appellant.

UNPUBLISHED
December 01, 2025
11:00 AM

No. 364803
Genesee Circuit Court
LC No. 2020-046964-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

SHARMEL TEAGUE,

      Defendant-Appellant.

No. 365083
Genesee Circuit Court
LC No. 2020-046960-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

LARRY EDWARD TEAGUE, JR.,

      Defendant-Appellant.

No. 365872
Genesee Circuit Court
LC No. 2020-046961-FC

---

Before: K. F. KELLY, P.J., and MARIANI and ACKERMAN, JJ.

PER CURIAM.

In these consolidated cases,[1] defendants, Ramonyea Travon Bishop (Bishop), Sharmel Teague (Sharmel), and Larry Edward Teague, Jr. (Larry), appeal by right their jury-trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[2] The trial court sentenced each of them to life in prison without the possibility of parole for first-degree murder and a consecutive term of two years' imprisonment for felony-firearm.[3] We affirm.

## I. BACKGROUND

These cases arise from the shooting death of a store employee at a store in Flint on May 1, 2020, shortly after 2:00 p.m. Surveillance cameras captured many of the events in question, and multiple eyewitnesses also testified about them. Sharmel and her daughter, Byra Bishop (Byra),[4] were intending to shop at the store on the day in question, but the victim did not allow Byra to enter because she was not wearing a mask, which was required at the time because of the COVID-19 pandemic. Sharmel became upset and began arguing with the victim. The verbal altercation escalated and Sharmel began yelling at the victim and calling him names, so the victim, with the assistance of another store employee, escorted Sharmel and Byra out of the store to the parking lot. After they did so, Sharmel turned around and spat on the victim's face. Upset, the victim hit Sharmel in response. Sharmel, with Byra as the sole passenger, then drove away in a GMC Envoy. Video surveillance footage and phone records established that around this same time, Sharmel pulled over, and a phone call was made from Sharmel's phone to Larry (Sharmel's husband) and then to Bishop (Sharmel's son) two minutes later. Shortly thereafter, Larry drove himself, Bishop, Sharmel, and Byra to the store in Sharmel's Envoy.

Video surveillance footage established that approximately 20 minutes after the altercation between Sharmel and the victim, a man—later identified as Bishop—got out of the Envoy at a traffic light a few blocks away from the store and began walking toward the store, arriving there about a minute later. At the same time, Sharmel's Envoy proceeded to the store and, when it arrived, Larry got out. Bishop then entered the store and could be seen holding an object in his right hand concealed in his pocket. Larry entered the store separately but very close in time to Bishop's entrance. Immediately upon entering the store, Larry began yelling, which prompted the victim and an assistant store manager to approach him. According to the assistant store manager, the victim began trying to calm Larry down. As the victim did so, Bishop approached the victim from behind, put a gun to his left temple, and fatally shot him. Bishop and Larry then fled the scene, running in opposite directions. Larry fled to Detroit and then to Houston, Texas, where he

[1] *People v Bishop*, unpublished order of the Court of Appeals, entered November 29, 2023 (Docket Nos. 364803; 365083; 365872).

[2] Bishop was convicted for his direct actions, and Sharmel and Larry were convicted under an aiding-and-abetting theory of the crimes.

[3] Larry was sentenced as a third-offense habitual offender, MCL 769.11.

[4] The prosecution also charged Byra in connection with the incident, but she pleaded no contest to lying to a police officer, tampering with evidence, and accessory after the fact. Her convictions are not at issue in these appeals.

was ultimately arrested five days after the shooting. Bishop fled to a friend's home in Bay City, where he was ultimately arrested seven days after the shooting.

At trial, Bishop testified on his own behalf, focusing on the core theory of his defense: that he killed the victim in defense of Larry. Bishop admitted to shooting the victim as depicted by the surveillance footage, but he maintained that he only did so because he saw the victim concealing a gun in his left pocket and believed that the victim was going to use it against Larry during their interaction. Multiple individuals involved in the criminal investigation testified that a gun with a filed-off serial number was located near the victim's body, but they were unable to determine who the gun belonged to or if the victim possessed it at the time of the shooting. The surveillance video did not show the victim holding a gun, pulling a gun from his pocket, or dropping a gun immediately after he was shot, and instead showed the victim keeping his left hand in his pocket throughout the entire ordeal. Several individuals from the store's corporate office testified that the victim would not have been permitted to carry a gun while working because it was against company policy, several of the victim's coworkers testified that he was not known to carry a gun at work, and several eyewitnesses testified that they did not recall seeing the victim with a gun.

Defendants were convicted and sentenced as previously described. Bishop and Sharmel subsequently filed postjudgment motions for a new trial, raising, in relevant part, nearly all of the same issues now challenged on appeal. In written opinions and orders, the trial court found no errors warranting relief and denied Bishop's and Sharmel's motions. These appeals followed.

II. EVIDENTIARY CHALLENGES

Defendants raise several evidentiary challenges on appeal.[5] We review a trial court's evidentiary rulings for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes. A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. (quotation marks and citations omitted). That said, "[t]he trial court necessarily abuses its discretion when it makes an error of law." *People v Wisniewski*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 361978); slip op at 7. "Preliminary questions of law, including whether a rule of evidence precludes the admission of evidence, are reviewed de novo." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013). Underlying constitutional issues are also reviewed de novo. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). A preserved, nonconstitutional evidentiary error does not warrant reversal "unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999) (quotation marks omitted).

---

[5] With one exception (as discussed more thoroughly *infra*), defendants properly preserved all of their evidentiary challenges for appellate review by objecting to the evidence on the same grounds now raised on appeal. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019).

## A. WITNESS TESTIMONY

Bishop and Larry argue that the trial court improperly allowed the assistant store manager to testify that Bishop and Larry planned the shooting ahead of time.

As indicated above, the assistant store manager witnessed the shooting firsthand. At trial, this witness testified that immediately upon entering the store, Larry began yelling very loudly and asking about the person who "put their hands on [his] wife," so the witness and the victim walked from the break room to the front of the store. The witness further testified that he stood nearby as the victim attempted "to calm [Larry] down," when a few seconds later he saw Bishop suddenly appear behind the victim, put a gun to the victim's temple, and shoot the victim. The witness stated that he "could see everything" clearly because he was within 10 feet of the victim and Larry and within five or six feet of Bishop when Bishop shot the victim. The witness further stated that everybody in the store reacted to the gunshot except Larry, who "never flinched." He explained: "[Larry] didn't react, he didn't jump, he didn't get startled, he was just standing there like nothing phased him." The witness also testified that he saw Larry look behind the victim and then take "a couple steps back" immediately before Bishop shot the victim. When asked by the prosecution what Larry's behavior indicated to him, he replied, "That [Larry and Bishop] set that up." Bishop's and Larry's attorneys objected on the ground that the answer was impermissible lay opinion testimony under MRE 701, and the prosecution rephrased the question.

Later in his testimony, the witness stated that, when he returned to the store after unsuccessfully chasing Bishop, he "asked everybody where did [Larry] go because [he] knew that that was planned." Bishop's and Larry's attorneys again objected on MRE 701 grounds, which the trial court sustained and struck the witness's response from the record. The prosecution subsequently asked the witness why he "thought [Larry and Bishop] were together," and he responded:

> Because you just don't come in yelling, making a big fuss, a big scene and then somebody comes around the corner, blindsides you and shoots you in the head. It just don't [sic] play out like that. That's just not something that you, you know what I'm saying, that will happen on a daily basis. That's . . . the only thing you can do is think that, you know, two people had to be together for that to happen like that . . . . It's from me, from what I, you know what I'm saying, use your common sense.

Bishop's and Larry's attorneys again objected on MRE 701 grounds, and following a bench conference, the prosecution continued questioning the witness.

Bishop and Larry argue that the witness's testimony constituted improper opinion testimony under MRE 701 because he testified that they planned or premeditated the shooting ahead of time. To start, contrary to their claims on appeal, the trial court did not allow the witness to provide such testimony. At a pretrial hearing, the court expressly ruled that the witness could "opine that one gentleman distracted the [victim] while the other pulled the trigger," but it did not allow him to "opine that the shooting in the store was planned." The court subsequently elaborated on this ruling at trial, stating that the witness's testimony on this point was admissible because "the video doesn't show it all" and the witness was one of two eyewitnesses "who perceived something

-4-

that . . . possibly the video isn't showing," and the court believed that his testimony would "aid the jury in determining any facts at issue in this case." Furthermore, the record clearly reflects that each time that this witness testified that the shooting was "planned," the court either struck the response from the record, had the prosecution rephrase the question, or had the prosecution move on with its line of questioning.

We see no error in the trial court's handling of this witness's testimony. As a lay witness, the assistant store manager could provide opinion testimony so long as it was (1) "rationally based on [his] perception," and (2) "helpful to a clear understanding of [his] testimony or the determination of a fact in issue." MRE 701.[6] And as the trial court duly recognized, although there was video evidence of the shooting, this witness was mere feet from the victim when he was shot and had personally observed things that were not fully captured by the video surveillance footage, including details regarding Larry's and the victim's respective demeanors and tones of voice during their interaction, where Larry was looking immediately before the shooting, and Larry's reaction (or lack thereof) to the shooting. An " 'opinion' is an inference or conclusion drawn by a witness from facts," *Dudek v Popp*, 373 Mich 300, 305; 129 NW2d 393 (1964), and this witness's testimony clearly reflected such an opinion—namely, that based on his personal observations of Larry's behavior immediately before and after the shooting, the witness had concluded that Larry and Bishop were acting together at the time of the shooting. Whether Larry had assisted Bishop in the shooting, whether the two had planned the shooting ahead of time, and whether Bishop had shot the victim in defense of Larry all presented facts at issue in the case; the witness's testimony about what he had observed, and what he had concluded based on those observations, was helpful to the jury's determination of them. That the witness's opinion testimony may have "embrace[d] . . . ultimate issue[s] to be decided by the trier of fact" did not alone render it "objectionable." MRE 704.

Bishop and Larry argue that the witness's testimony improperly invaded the province of the jury because it opined on their intent at the time of the shooting, which was "an ultimate issue that the jury was fully competent to determine on its own" from other evidence, such as the video surveillance footage. As already noted, however, this witness's testimony was not "objectionable just because it embrace[d] an ultimate issue," MRE 704, nor was the witness simply opining on matters that he was no better positioned than the jury to evaluate, see *People v Fomby*, 300 Mich App 46, 52-53; 831 NW2d 887 (2013). To the contrary, other than Larry and Bishop, the witness was the only other person within a few feet of the victim at the time of the shooting and was in the best position to observe and assess the involved parties' behaviors at that time—something which the other evidence at trial did not comparably capture. On this record, Bishop and Larry have not shown that the witness's admitted testimony improperly opined on their guilt or impermissibly invaded the province of the jury, see *id*., or that the trial court's handing of the testimony was outside the range of principled outcomes, see *Thorpe*, 504 Mich at 251-252. Accordingly, Bishop and Larry have not demonstrated entitlement to relief on this issue.

---

[6] Our Supreme Court revised the Michigan Rules of Evidence effective January 1, 2024. See 512 Mich lxiii (2023). We cite the version of the rules in effect at the time of defendants' trial.

## B. POLICE WITNESS TESTIMONY

Sharmel argues that an investigating detective improperly testified that she was being evasive and untruthful during a police interview.

At trial, an investigating detective recounted the details of his interview of Sharmel about the shooting shortly after it had occurred. The detective testified that, during the interview, Sharmel provided "a lot of detail" when "asked about things that were not related to the case," but she did not do so when asked about things that occurred "immediately before and after the shooting." Specifically, Sharmel indicated that "she made several phone calls" to Bishop and Larry immediately before the shooting and had received several phone calls from them immediately after the shooting, but when asked about the specifics of those conversations, she repeatedly stated that she "couldn't remember" and had "no recollection of th[ose] particular conversation[s]." The detective testified that Sharmel's responses were "a concern" to him because it was "an indication that she's being evasive" and that "she's not being truthful" during the interview.

Sharmel argues that this testimony amounted to improper commentary on her credibility and ultimate guilt. Because Sharmel failed to object to the testimony on that ground at trial, this issue is unpreserved. See *Thorpe*, 504 Mich at 252.[7] "Unpreserved claims of evidentiary error are reviewed for plain error affecting the defendant's substantial rights." *People v Brown*, 326 Mich App 185, 195; 926 NW2d 879 (2019) (quotation marks and citation omitted). To obtain appellate relief, the defendant must show: (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To satisfy the third element, the defendant must show that the error "affected the outcome of the lower court proceedings." *Id*. And even when these three requirements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Allen*, 507 Mich 597, 614; 968 NW2d 532 (2021) (quotation marks and citation omitted).

"A witness may not comment on . . . the credibility of another witness" or "opine about the defendant's guilt or innocence in a criminal case" because doing so "invades the province of the jury to determine issues in a case." *People v Serges*, ___ Mich App ___, ___; ___ NW2d ___ (2024) (Docket No. 355554); slip op at 15 (quotation marks, citations, and alteration omitted). "Nevertheless, a police officer may testify about his or her perceptions during the course of an investigation of whether a defendant was being truthful." *People v Lowrey*, 342 Mich App 99,

---

[7] Sharmel raised the issue in her postjudgment motion for a new trial, but raising an evidentiary issue for the first time in such a motion is insufficient to preserve the issue. See *People v Butsinas*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 364778); slip op at 10-12. In any event, for the reasons discussed above, Sharmel has not shown that an error occurred; accordingly, she would not be entitled to relief on this claim even if she had properly preserved it below.

109; 993 NW2d 62 (2022). Nor is an officer "entirely forbidden" from "express[ing] the belief that a statement made by a defendant during the course of an investigation was untrue." *Id*. at 112.

The detective's testimony in this case fits squarely within the confines of this caselaw. To start, Sharmel did not testify at trial, so the detective's testimony did not purport to comment on "the credibility of another witness." *Serges*, ___ Mich App at ___; slip op at 15 (quotation marks and citation omitted). And, as noted above, an officer may testify about a defendant's apparent untruthfulness during an investigative interview so long as it is based on his perceptions during the course of the investigation. *Lowrey*, 342 Mich App at 109, 112. Here, it is clear from the record that the detective's testimony regarding Sharmel's truthfulness was based on his perceptions during his interview of Sharmel. Indeed, the detective testified that he did not believe that Sharmel was being truthful about the shooting during her interview because she provided significant detail when discussing things unrelated to the case but stated that she could not remember things that occurred immediately before or after the shooting—which had occurred only hours before the interview. Accordingly, because the detective's testimony did not improperly comment on Sharmel's credibility as a witness or on her guilt as a criminal defendant, the trial court did not err by admitting the testimony. See *Carines*, 460 Mich at 763; see also *Serges*, ___ Mich App at ___; slip op at 15.

## C. THE VICTIM'S CRIMINAL HISTORY

Bishop argues that the trial court erred by excluding evidence of the victim's criminal history, which prohibited the victim from possessing a gun at the time of the shooting. Bishop further argues that because his defense theory at trial was that he shot the victim in defense of Larry, the court's exclusion of this evidence violated his constitutional right to present a defense. We do not see merit in Bishop's arguments.

First, the evidence was not admissible under MRE 404(a)(2) as Bishop claims. MRE 404(a)(2) is an exception to the rule that character evidence is generally inadmissible to prove that a person "act[ed] in conformity therewith on a particular occasion," and provides, in relevant part, that a defendant charged with homicide may admit evidence of the victim's aggressive character "[w]hen self-defense is an issue." See also *People v Leffew*, 508 Mich 625, 638-639; 975 NW2d 896 (2022) (recognizing that the self-defense and defense-of-others doctrines have the same essential elements). This type of character evidence, however, may only be admitted in the form of reputation or opinion testimony rather than specific instances of conduct, unless (1) character is an essential element of a charge, claim, or defense, or (2) the testimony regarding those specific instances is independently admissible for some other reason. MRE 405; *People v Harris*, 458 Mich 310, 316-319; 583 NW2d 680 (1998); *People v Edwards*, 328 Mich App 29, 36-37; 935 NW2d 419 (2019). Whether a defendant had a reasonable apprehension of harm—i.e., whether the defendant "had a reasonable belief that he had to use deadly force to prevent . . . death or . . . great bodily harm to" another—at the time of the homicide is an essential element of a defense-of-others claim, and it is "well-settled law that specific acts of aggression by the decedent," if known to the defendant at the time of the homicide, "are admissible to establish a defendant's reasonable apprehension of harm." *Edwards*, 328 Mich App at 35-38.

In this case, Bishop sought to introduce evidence of the victim's prior criminal history. Bishop argued that this evidence was necessary to establish his defense-of-others claim because

the victim "was a convicted felon" who could not legally possess a gun at the time of the shooting, an unidentified gun was found near the victim's body, and evidence of the victim's criminal history "necessarily . . . goes towards aggression." But the mere fact that the victim was a convicted felon who could not legally possess a gun does not inherently equate to "a trait of character for aggression." MRE 404(a)(2).[8] Nor is it apparent how such evidence would be properly relevant to proving Bishop's defense-of-others claim. Bishop's primary purpose in offering evidence of the victim's criminal history was to show that the victim was the aggressor in the incident, which was an inadmissible use of specific-acts evidence under MRE 405. See *Edwards*, 328 Mich App at 36, citing *Harris*, 458 Mich at 319. And, to the extent that Bishop was attempting to use this evidence to show that he had a reasonable apprehension of harm at the time of the shooting, it is difficult to see how the evidence might be admissible for that purpose given that there is nothing to suggest Bishop had any prior knowledge of the victim's prior conviction. See *Harris*, 458 Mich at 317 ("The purpose of this evidence is to show the defendant's state of mind; therefore, it is obvious that the victim's character, as affecting the defendant's apprehensions, must have become known to him, otherwise it is irrelevant.").

Bishop's argument that evidence of the victim's criminal history was also admissible under MRE 404(b)(1) is equally unpersuasive. MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Bishop argues that the evidence is probative of the victim's intent to pull a gun from his pocket and use it against Larry. But even assuming that the victim possessed the unidentified gun later found near his body (which is not at all clear from the trial evidence), Bishop fails to explain how the mere fact that the victim could not possess a gun due to a prior conviction would be probative of the victim's intent to use it against Larry. Instead, this theory simply attempts to use the victim's prior conviction to draw an impermissible propensity inference about the victim. See MRE 404(b)(1); *People v Denson*, 500 Mich 385, 397; 902 NW2d 306 (2017) (noting that MRE 404(b)(1) reflects "the deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes").

Relatedly, Bishop argues that the evidence is probative of identifying the gun as belonging to the victim. According to Bishop, the gun found near the victim's body had an "obliterated serial number," and the victim's prior conviction prohibiting him from legally possessing a gun would help explain why the victim would have such a gun in his possession. This theory, however, is purely speculative, and the fact of a prior conviction would seem to at least equally suggest,

---

[8] For instance, an individual may be deemed a convicted felon unable to legally possess a gun for a specified period of time after he or she is convicted of embezzlement of $1,000 or more. See MCL 750.174(4)-(7); MCL 750.224f(1) and (10)(b).

consistent with the trial testimony of several of the victim's coworkers, that the victim had a particular reason *not* to have any gun in his possession at all. But even assuming it is probative of the victim's ownership of the gun, Bishop still does not explain how that would be properly relevant to whether the victim intended to, or in fact did, pull out the gun in question and to whether Bishop had a reasonable apprehension that the victim was going to use that gun against Larry. Nor does he explain how any such tenuous probative value would not be substantially outweighed by the danger of unfair prejudice from admitting evidence of the victim's prior conviction, given the improper propensity inference the jury may draw once exposed to that evidence. See MRE 403; MRE 404(b)(1).

In sum, because evidence of the victim's criminal history was not admissible under MRE 404(a)(2) or MRE 404(b)(1), Bishop has not shown that the trial court abused its discretion by excluding the evidence at trial. See *Thorpe*, 504 Mich at 251-252. And Bishop has also not shown how, in the absence of any such error, his constitutional right to present a defense may have nonetheless been violated. We see no basis for relief as to this issue.

## D. JURY VIEW OF THE CRIME SCENE

Defendants argue that the trial court abused its discretion by allowing a jury view of the scene where the shooting occurred and by denying their subsequent motions for a mistrial on that basis. Specifically, Bishop and Sharmel argue that the jury view was needlessly cumulative evidence and risked juror confusion, and all three defendants argue that it amounted to a due-process violation warranting reversal because the "heavy" police presence during the jury view created a presumption of guilt.

We review for an abuse of discretion a trial court's decision on "[w]hether to grant a motion for a jury view." *People v Herndon*, 246 Mich App 371, 418; 633 NW2d 376 (2001). We also review for an abuse of discretion a trial court's decision regarding a motion for a mistrial. *People v Boshell*, 337 Mich App 322, 335; 975 NW2d 72 (2021).

The prosecution moved for a jury view of the interior and exterior of the store where the shooting occurred, arguing that the jury view would help the jury understand the routes Bishop and Larry took before and after the shooting, as well as the entire timeline of events from when Bishop and Larry arrived at the store until their flight immediately after the shooting. Defendants objected, arguing that the prosecution did not need the jury view and that witness testimony and video surveillance footage from the store would suffice. Defendants also argued that the store had recently been remodeled and looked different than it had at the time of the shooting, so a jury view would offer little, if any, useful information to the jury. The trial court granted the jury view over defendants' objections,[9] noting that the view would "give the jury a better understanding of the timeline of the to and . . . from—as it relates to the dollar store," including when "the subject

---

[9] The prosecution first moved for a jury view a few weeks before trial, and the trial court initially denied the request. The prosecution subsequently moved for reconsideration of that decision during trial and, after considering the parties' arguments, the trial court permitted the jury view.

vehicle stopped, how long it stopped, and how long it took to get to the next, you know, destination, or the next point along the way."

As noted, Bishop and Sharmel contend that the trial court abused its discretion by allowing the jury view. MCL 768.28 provides that "[t]he court may order a view by any jury empaneled to try a criminal case, whenever such court shall deem such view necessary." "It is within the trial court's discretion to order a jury view of the crime scene." *People v Unger*, 278 Mich App 210, 255; 749 NW2d 272 (2008).

It was not unreasonable for the trial court in this case to conclude that a jury view of the store was necessary because it would assist the jury in understanding the progression of events surrounding the shooting in light of the evidence the jury had already received. It is clear from the record that the in-person view was useful to understanding where Sharmel's Envoy was parked when it arrived at the store—something that could not be seen in the surveillance video footage presented to the jury—as well as to understanding how long it took Bishop and Larry to independently walk to the store, to walk around the store immediately before the shooting, and to flee the store immediately after the shooting based on the exit routes they took. Indeed, both the prosecution and defense counsel stated on the record that they had themselves viewed the interior and exterior of the store prior to trial and that the view had helped them better understand these points. And although the store's interior had been remodeled since the time of the shooting, the scene remained sufficiently similar to assist the jury in understanding certain concepts at issue in this case; only some of the aisles in the store had been reorganized, and testimony detailing any changes that occurred after the shooting was provided to the jury. See, e.g., *id.* at 255-256. Moreover, the court instructed the jury that it "must not consider anything you learned from seeing the premises that was not covered by the evidence admitted in the trial." See *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2010) ("Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors."). On this record, the trial court's decision to grant the prosecution's request for a jury view was not outside the range of reasonable and principled outcomes. See *Thorpe*, 504 Mich at 252; *Unger*, 278 Mich App at 255; *Herndon*, 246 Mich App at 418.

Additionally, all three defendants argue that the "heavy" police presence displayed during the jury view warranted a mistrial and that the trial court abused its discretion by denying their motions for a mistrial on that basis. After the jury view occurred, defendants moved for a mistrial based on "the extensive firepower"—i.e., the police presence—that was in place during the view. The court concluded that a mistrial was not warranted, stating, in relevant part:

> [T]he Court finds that the number of law enforcement officials present at the jury view and their respective locations collectively and individually during transit to and from the subject site, and in and surrounding the site, including patrol vehicles with activated lights found in the parking lot of and along closed off streets proximate the site did not undermine the presumption of innocence of defendants here.
>
> The Court finds further that the amount and type of weaponry possessed by the deputies or other law enforcement officials was not a reflection upon any perceived danger posed by defendants, but rather, was a reasonable and necessary

-10-

effort of local law enforcement to protect, safeguard and secure defendants, counsel, jury members, and others, especially considering the high-profile nature of this case.

"A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant and impairs his [or her] ability to get a fair trial[.]" *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995) (citations omitted). The court concluded that the amount of police presence at the view was both reasonable and necessary to protect everyone involved, including defendants, and did not undermine the presumption of innocence such that defendants would be denied a fair trial. We fail to see an error in this assessment. Moreover, the court instructed the jury that "[t]he Genesee County Sheriff's office present there at the time of the viewing was tasked with protecting you and the attorneys and defendants" and that "[s]uch protection must not be considered against the defendants in any way." It is presumed that the jurors followed these instructions. See *Mahone*, 294 Mich App at 212. Accordingly, the trial court did not abuse its discretion by denying defendants' motions for a mistrial based on the police presence during the jury view and, correspondingly, there was no due-process violation warranting reversal. See *Boshell*, 337 Mich App at 335; *Hawkins*, 245 Mich App at 457; *Haywood*, 209 Mich App at 228.

## III. SUFFICIENCY OF THE EVIDENCE

Larry contends that the prosecution presented insufficient evidence to support his convictions and thus violated his due-process rights. In determining whether the evidence is sufficient to sustain a conviction, we review the record evidence de novo in the light most favorable to the prosecution and consider whether it was sufficient "to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of a crime, and it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Walker*, 330 Mich App 378, 382; 948 NW2d 122 (2019) (quotation marks, citations, and alteration omitted). It is the jury's role, as factfinder, to determine "the weight of the evidence [and] the credibility of witnesses," *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008), and "a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict," *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citation omitted).

In this case, the jury found Larry guilty of first-degree murder and felony-firearm under an aiding-and-abetting theory of the offenses. For the jury to find Larry guilty of these offenses as an aider and abettor, the prosecution was required to prove:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. [*People v Plunkett*, 485 Mich 50, 61; 780 NW2d 280 (2010) (quotation marks, citations, and alteration omitted).]

"An aider and abettor's state of mind may be inferred from all the facts and circumstances," and factors to be considered in determining whether a defendant aided and abetted the commission of

-11-

a crime "include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Carines*, 460 Mich at 757-758 (quotation marks and citation omitted). A defendant's mere presence, "even with knowledge that an offense is about to be committed or is being committed," is insufficient to establish that he or she was an aider and abettor. *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999).

Larry does not challenge the jury's determination that Bishop fatally shot the victim in the store or the sufficiency of the evidence to support Bishop's convictions on that basis. Rather, Larry only argues on appeal that the prosecution failed to present sufficient evidence to establish that he aided or encouraged Bishop during the commission of the offenses and that he intended, or knew that Bishop intended, the commission of the offenses at that time. We disagree.

To start, Larry provides little meaningful argument or factual support for his position that the prosecution failed to sufficiently prove the elements of an aiding-and-abetting theory. See *People v Burkett*, 337 Mich App 631, 639 n 4; 976 NW2d 864 (2021) ("An appellant may not simply announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments[.]") (quotation marks, citation, and alteration omitted). In any event, the prosecution presented sufficient evidence from which a rational jury could conclude beyond a reasonable doubt that Larry performed acts or gave encouragement that assisted Bishop in the shooting and that he intended or knew that Bishop intended the shooting to occur. It is undisputed that Larry is Bishop's stepfather. See, e.g., *Carines*, 460 Mich at 757-758. Additionally, video evidence and testimony from multiple witnesses, including Bishop, established that Larry was very angry about the victim's earlier interaction with Sharmel and wanted to fight the victim. Bishop further testified that, shortly after he and Larry learned about the victim's earlier interaction with Sharmel, Larry drove Sharmel's Envoy to the store (with Bishop, Sharmel, and Byra as passengers) to confront the victim. Testimony and video evidence also established that Larry dropped Bishop off a few blocks away from the store so that Bishop could walk the remainder of the way; that Larry entered the store very shortly after Bishop did; that Larry began yelling and making a scene immediately thereafter; and that, while Larry was doing this, Bishop snuck up behind the victim, put a gun to his temple, and shot him. Multiple eyewitnesses testified that the gunshot occurred within seconds of Larry yelling and, as discussed, the assistant store manager testified that he saw Larry take a few steps back from the victim immediately before Bishop shot the victim from behind. The assistant manager further testified that Larry "didn't react," "jump," or "get startled" by the gunshot, and he instead "was just like standing there like nothing phased him." Additionally, Bishop and Larry both immediately fled the store after the shooting, with Larry ultimately fleeing to Texas where he was arrested approximately five days later.

Given this evidence, a rational jury could have found beyond a reasonable doubt that Larry was more than merely present during the shooting and that instead he, through his actions or encouragement, assisted Bishop in the shooting and intended or knew that Bishop intended the shooting to occur. See *Plunkett*, 485 Mich at 61; *Carines*, 460 Mich at 757-758; see also *Norris*, 236 Mich App at 419-420. Accordingly, there was sufficient evidence to support Larry's convictions of first-degree murder and felony-firearm under an aiding-and-abetting theory, and there was no due-process violation on this basis.

## IV. BISHOP'S RIGHT TO SILENCE

All three defendants argue that their due-process rights were violated when the prosecution attempted to impeach Bishop using his post-arrest, post-*Miranda*[10] silence. "Whether [a] defendant was improperly impeached with his silence is a question of law that [this Court] review[s] de novo." *People v Clary*, 494 Mich 260, 264; 833 NW2d 308 (2013). We review de novo "preserved constitutional errors to determine whether the beneficiary of the error has established that the error was harmless beyond a reasonable doubt." *People v Sammons*, 505 Mich 31, 41, 56; 949 NW2d 36 (2020).

The United States Supreme Court's holding in *Doyle v Ohio*, 426 US 610, 618-619; 96 S Ct 2240; 49 L Ed 2d 91 (1976), "prohibits the admission of post-arrest, post-*Miranda* silence with the police." *Clary*, 494 Mich at 271. This silence "cannot be used to impeach a defendant's exculpatory testimony or as direct evidence of [a] defendant's guilt in the prosecut[ion]'s case-in-chief[.]" *People v Shafier*, 483 Mich 205, 213-214; 768 NW2d 305 (2009) (citations omitted). Such prosecutorial references "violate a defendant's due process rights." *Id*. at 212-213.

During cross-examination in this case, the prosecution asked Bishop: "[Y]ou had two and a half years to tell police what happened. . . . Why didn't you?" Bishop's attorney objected, and the trial court instructed Bishop not to answer, but Bishop nonetheless responded, "Because I have a right to enjoy a trial." The prosecution then asked, "And it never occurred to you to say you know what, it was self-defense [sic]?" Bishop's attorney again objected, and the court told the parties to "[s]top right there," but Bishop still responded, "That's what the jury of my peers is for." Following a brief bench conference, the prosecution moved on from this line of questioning.

Even assuming this exchange amounted to a *Doyle* violation, the prosecution has shown that it was harmless beyond a reasonable doubt. See *Sammons*, 505 Mich at 56. "When evaluating whether erroneously admitted evidence was harmless beyond a reasonable doubt, we must determine the probable effect of that testimony on the minds of an average jury." *Id*. (quotation marks and citations omitted). And when looking at all of the evidence in this case, we do not believe that "the average jury would have found the prosecution's case significantly less persuasive without the erroneously admitted testimony." *Id*. (quotation marks and citation omitted).

Throughout direct examination, Bishop repeatedly offered testimony about his decision to remain silent and explained why he did not call the police any time after the shooting. Bishop testified that he never told the police—either during his initial post-arrest, post-*Miranda* interview or at any other time—that he saw the victim attempt to pull a gun on Larry (as he claimed at trial), that he never contacted the police after the shooting because he was afraid to come forward, and that he initially told the investigating detective at the start of his post-arrest interview that "it wasn't me," because he "was scared." In light of this offered testimony, it is difficult to see how any of the defendants were meaningfully prejudiced by the prosecution's ensuing, brief questioning on the topic during its cross-examination of Bishop—particularly in light of the other ample, untainted evidence of their guilt. This evidence included testimony regarding Sharmel's altercation with the victim shortly before the shooting; evidence that, immediately after the altercation, phone calls

---

[10] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

were placed to both Larry and Bishop from Sharmel's phone; video evidence of defendants thereafter driving to the store, with Bishop getting out a few blocks away and walking the remaining distance; video evidence of Bishop entering the store, and then Larry entering shortly after Bishop and immediately making a scene; video evidence of Bishop shooting the victim and fleeing immediately thereafter; Bishop's admissions at trial that he shot the victim, fled the store, and evaded the police for approximately a week; evidence of Larry's post-shooting flight from the store and ensuing out-of-state evasion of the police; testimony of several eyewitnesses that the victim was not known to carry a gun on him at work, and of multiple employees of the store's corporate office that the victim was not permitted to carry a gun while on the job; and testimony of several eyewitnesses regarding the entire series of events in the store, including the assistant store manager's testimony that Bishop had run up behind the victim as he was attempting to calm Larry down and shot him in the temple.

Furthermore, as the challenged questions were occurring, the trial court instructed Bishop not to answer, but he did so anyway. The prosecution also immediately moved on to a different line of questioning after Bishop's attorney objected. And at the close of proofs, the trial court provided a curative instruction to the jury expressly telling them that Bishop's "silence after he received his [*Miranda*] warnings up until he exercised his right to testify during trial may not be used against him for any purpose," and it is presumed that the jurors followed these instructions. *Mahone*, 294 Mich App at 212. Taken together, all of these considerations make clear that any error as to the challenged questions was harmless beyond a reasonable doubt. Accordingly, defendants are not entitled to relief on this basis. See *Sammons*, 505 Mich at 56.[11]

## V. VOLUNTARY-MANSLAUGHTER INSTRUCTION

Bishop and Sharmel argue that the trial court should have instructed the jury on voluntary manslaughter and that its failure to do so deprived them of due process.

"A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). A trial court must "give instructions on any theory or defense supported by the evidence upon request." *People v Ogilvie*, 341 Mich App 28, 35; 989 NW2d 250 (2022). Such an instruction is warranted "if a rational view of the evidence supports [it]." *People v Armstrong*, 305 Mich App 230, 240; 851 NW2d 856 (2014). Jury instructions must be considered in their entirety "to determine whether the court omitted an element of the offense, misinformed the jury on the law, or otherwise presented erroneous instructions." *People v Hartuniewicz*, 294 Mich App 237, 242; 816 NW2d 442 (2011). "We review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the

---

[11] Bishop and Sharmel also argue that the trial court abused its discretion by denying their respective motions for a mistrial on this basis. The trial court denied their motions because it found that any error was harmless and that a curative instruction was sufficient to rectify any error; as already discussed, we agree with that assessment. See *Sammons*, 505 Mich at 56; *Mahone*, 294 Mich App at 212. Additionally, defendants were given the opportunity to craft the exact language they wanted for the curative instruction—which they did—and the court ultimately instructed the jury using that language.

case for an abuse of discretion." *People v Everett*, 318 Mich App 511, 528; 899 NW2d 94 (2017) (quotation marks and citation omitted).

Voluntary manslaughter is a "necessarily included lesser offense[]" of murder. *People v Yeager*, 511 Mich 478, 490; 999 NW2d 490 (2023). "Both murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." *Id*. at 489 (quotation marks and citation omitted). Murder, however, "possess[es] the single additional element of malice." *People v Reese*, 491 Mich 127, 144; 815 NW2d 85 (2012) (quotation marks and citation omitted). This malice element is negated, and the crime is therefore voluntary manslaughter, when the defendant "kill[s] in the heat of passion . . . caused by adequate provocation" with no "lapse of time during which a reasonable person could control their passions." *Yeager*, 511 Mich at 489-490.

In this case, the trial court found that a rational view of the evidence did not support a voluntary-manslaughter instruction because it was unreasonable to conclude that Bishop was so disturbed by emotional excitement at the time of the shooting that he, or a reasonable person in his position, would have acted on impulse. And when denying Bishop's and Sharmel's postjudgment motions for a new trial on this basis, the court further explained that no "reasonable juror would . . . have concluded that there was an 'emotional excitement' sufficient to provoke a reasonable person to act rashly and without deliberation" because the evidence in this case clearly established that "the victim was acting as a peace maker" and "trying to calm everyone down" at the time of the shooting. The court concluded that because a rational view of the evidence did not demonstrate that Bishop was adequately provoked—a "fundamental characteristic of voluntary manslaughter"—a voluntary-manslaughter instruction was not warranted.

Bishop and Sharmel have not shown that the court erred in this determination. They make much of the fact that Bishop was in an elevated emotional state at the time of the shooting, arguing that Bishop was acting out of sheer panic for Larry's safety when he shot the victim. As the trial court acknowledged, however, a touchstone requirement of voluntary manslaughter is adequate provocation, and a heightened level of "emotional excitement" in itself is not enough to warrant a voluntary-manslaughter instruction. *Id*. at 489. Rather, to constitute adequate provocation, Bishop's emotional excitement must have been so high that it both caused him "to act out of passion rather than reason" and would have "cause[d] a reasonable person to lose control, not just the specific defendant." *Id*. When looking at all of the evidence in this case, it does not rationally support the conclusion that Bishop's emotional state met this legal standard. See *id*.

Bishop was undisputedly upset when he learned about the victim's earlier interaction with Sharmel at the store. But any resulting emotional state is insufficient to constitute adequate provocation because enough time had passed between then and the shooting for Bishop to "control [his] passions." *Id*. And while a heightened emotional state based on Bishop's alleged fear for Larry's safety is more immediate to the shooting, neither Bishop nor Sharmel offer any caselaw indicating that simply seeing a family member engaged in a verbal dispute that could potentially result in them getting hurt is sufficient to constitute adequate provocation negating malice. See *id*. at 489-490 (noting that malice is "negated by the presence of provocation *and* heat of passion") (quotation marks and citation omitted; emphasis added). There was, for instance, no evidence of physical contact during the dispute or that the victim did or said anything overtly inflammatory at

that time; to the contrary, as the trial court acknowledged, the evidence indicated that the victim was behaving calmly and was attempting to calm Larry down. Cf., e.g., *People v Pouncey*, 437 Mich 382, 391; 471 NW2d 346 (1991) (finding the evidence insufficient to establish adequate provocation where "the decedent insulted the defendant" but "[t]here was no physical contact of any kind" between them). And by his own admission at trial, Bishop shot the victim before any immediate threat to Larry materialized. Specifically, Bishop testified that the victim's left hand (which Bishop asserted was on the handle of a gun) never left his pocket because Bishop shot the victim first so as to not "give [the victim] a chance to kill [his] stepfather."

Under "a rational view of the evidence" presented in this case, a reasonable jury could not find that Bishop killed the victim "in the heat of passion . . . caused by adequate provocation" with no "lapse of time during which a reasonable person could control their passions." *Yeager*, 511 Mich at 489-490 (quotation marks and citation omitted). The trial court did not abuse its discretion by determining that a voluntary-manslaughter instruction was inapplicable to the facts of this case and therefore did not err by refusing to instruct the jury accordingly. See *Everett*, 318 Mich App at 528. Accordingly, Bishop and Sharmel were not deprived of their due-process rights on this basis.

VI. ANONYMOUS JURY

Defendants argue that the trial court erred during voir dire by referring to the jurors only by numbers and not by names, thereby denying defendants their due-process rights. Bishop and Sharmel preserved this issue by raising it in their postjudgment motions for a new trial, but Larry did not preserve this issue because he failed to raise it in the trial court. See *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). When preserved, a trial court's "decision concerning the conduct of voir dire," such as a "court's decision to refer to jurors by number rather than by name," is reviewed for an abuse of discretion. *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). When unpreserved, however, the same issue is reviewed for plain error affecting substantial rights. *Hanks*, 276 Mich App at 92.

"An 'anonymous jury' is one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public." *Williams*, 241 Mich App at 522-523 (quotation marks and citation omitted). A jury is not anonymous unless "something more than just the jurors' names is withheld from the parties," such as "certain biographical information about potential jurors." *Hanks*, 276 Mich App at 93 (quotation marks and citation omitted). "An anonymous jury implicates the following interests: (1) the defendant's interest in being able to conduct a meaningful examination of the jury and (2) the defendant's interest in maintaining the presumption of innocence." *Id*. (quotation marks and citation omitted). "A challenge to an anonymous jury will only succeed where the record reflects that withholding information precluded meaningful voir dire or that the defendant's presumption of innocence was compromised." *Id*. (quotation marks and citation omitted). Absent a successful challenge to an anonymous jury, mere use of "juror numbers instead of names at trial" does not violate a defendant's due-process rights. *Williams*, 241 Mich App at 525.

When addressing this issue in Bishop's and Sharmel's motions for a new trial, the trial court in this case determined that no error occurred at voir dire because the jurors' biographical information was not withheld from the parties, and so the jurors were not truly "anonymous." This determination aligns with this Court's holdings in *Hanks* and *Williams*, and we see no error in it.

The record reflects that the trial court used juror numbers instead of names during voir dire, but there is nothing indicating that the jurors' biographical information was withheld from the parties during this time. See *Hanks*, 276 Mich App at 93-94; *Williams*, 241 Mich App at 522-524. Nor do defendants contend as much on appeal. There is also "no indication that any of the jurors believed that there was any significance in the use of numbers instead of names." *Hanks*, 276 Mich App at 94.[12] And both below and on appeal, defendants have offered nothing to demonstrate that the trial court's use of juror numbers instead of names prevented them "from conducting meaningful voir dire" or compromised their presumption of innocence. *Id.* Because the jury was "anonymous only in a literal sense . . . , none of the dangers of an 'anonymous jury' was implicated," and, accordingly, defendants are not entitled to relief on this issue. *Id.* (citation omitted); see also *Williams*, 241 Mich App at 523-525.[13]

## VII. SPOUSAL PRIVILEGE

Sharmel argues that she should not have been tried jointly with Larry and Bishop because she and Larry are married. Specifically, Sharmel asserts that her and Larry's marriage implicated the spousal privilege, which impacted their respective abilities to testify in their own defense, and separate trials were therefore necessary. But "[s]everance is mandated under MCR 6.121(C) only when a defendant demonstrates that h[er] substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice," *People v Hana*, 447 Mich 325, 331; 524 NW2d 682 (1994), and Sharmel makes no attempt to demonstrate either of these requirements. Rather, she suggests in a conclusory fashion that this privilege impacted her decision not to testify, but fails to meaningfully develop or substantiate that proposition. See *Burkett*, 337 Mich App at 639 n 4. Sharmel has thus failed to demonstrate that there was any error requiring reversal on this issue. See *id.*

## VIII. PROSECUTORIAL MISCONDUCT

Bishop and Sharmel raise multiple claims of prosecutorial misconduct. None of these challenges were preserved because neither defendant contemporaneously objected to the alleged instances of misconduct and requested a curative instruction. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Accordingly, we review these challenges for plain error affecting substantial rights. See *id.*

Claims of prosecutorial misconduct are reviewed on a "case-by-case basis" by examining pertinent portions of the record and evaluating "the prosecutor's remarks in context." *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017) (quotation marks and citation omitted). "This Court also must review the prosecution's comments in light of the arguments made by defense counsel and the relationship they bear to the evidence admitted at trial." *Wisniewski*, ___

---

[12] Bishop contends that the prosecution told the jurors that numbers were being used instead of names for their " 'safety and protection.' " Such a statement, however, does not appear at the transcript page cited by Bishop in his appellate brief and we have not located it elsewhere in the transcripts.

[13] We also reject Bishop's request for a conflict panel under MCR 7.215(J)(2) as to this issue.

Mich App at ___; slip op at 13 (quotation marks and citations omitted). Prosecutors are generally afforded "great latitude regarding their arguments and are free to argue the evidence and all reasonable inferences from the evidence as they relate to their theory of the case." *Mullins*, 322 Mich App at 172 (quotation marks and citation omitted). We will not reverse where the alleged prejudicial effect of the prosecution's conduct could have been cured by a timely instruction. *Bennett*, 290 Mich App at 476.

Bishop first argues that the prosecution committed misconduct by misrepresenting evidence presented at trial, thereby misleading the jury. Specifically, Bishop argues that the prosecution "exacerbated the court's error" in excluding evidence of the victim's criminal history by improperly referring to the victim as a "security guard" when testimony from employees of the store's corporate office established that he was employed as a "greeter" rather than a "security guard." The record reflects that the prosecution did refer to the victim as a "security guard" on multiple occasions throughout trial, but when reviewing these statements in context, it is clear the prosecution did so because several witnesses who regularly worked with the victim referred to him as a "security guard" during their testimony. Indeed, two store employees each referred to the victim as "our security guard," and the store manager referred to him as "my security guard, my greeter." A shopper at the store also described the victim as a "security guard" and testified that she knew him because "[h]e's security at various stores and nightclubs and things like that." And it is clear that these references were not implying that the victim's status as a "security guard" meant that he was permitted to carry a gun (indeed, ample testimony expressly stated the opposite), but only that he was seen and treated as security for the store by his coworkers and some shoppers. Accordingly, Bishop has not shown any misconduct in this regard. See *id*. at 475.

Bishop also argues that the prosecution improperly vouched for the credibility of the assistant store manager by referring to him as a "good guy" during closing argument. Although the prosecution "cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness," the prosecution is permitted to "comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Isrow*, 339 Mich App 522, 529-530; 984 NW2d 528 (2021) (quotation marks and citations omitted). When reviewed in context, the prosecution's remark was merely a passing reference to the assistant store manager being a "good guy" based on how he acted during the shooting, and there was no apparent suggestion of some special knowledge of the witness's truthfulness. Bishop has not shown misconduct as to this remark, either. *Bennett*, 290 Mich App at 475.

As to her claim of error, Sharmel argues the prosecution committed misconduct by repeatedly referring to her daughter Byra, one of the prosecution's own witnesses, as a liar. During direct examination, the prosecutor asked Byra numerous times why she was lying during her testimony and made several additional references to her alleged untruthfulness. But MRE 607[14] allowed the prosecution to attack the credibility of its own witness. The prosecution also had Byra

---

[14] At the time of defendants' trial, MRE 607 provided: "The credibility of a witness may be attacked by any party, including the party calling the witness."

declared a hostile witness before continuing this line of questioning pursuant to MRE 611(d)(3).[15] Furthermore, that Byra repeatedly lied or was "a liar" was elicited from Byra herself. During her testimony, Byra admitted that she lied to the police multiple times during their investigation, including when she stated to them that she told Bishop he could not come to her apartment after the shooting, that Bishop had gotten a ride after the shooting, and that Sharmel (rather than she, from Sharmel's phone) had called Larry and Bishop immediately after Sharmel's earlier interaction with the victim. Byra also admitted to pleading no contest to lying to a police officer, tampering with evidence, and accessory after the fact in connection with this case. On this record, Sharmel has not shown that the prosecutor's remarks amounted to misconduct. See *Bennett*, 290 Mich App at 475.

## IX. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, Bishop argues that his trial counsel was ineffective for failing to: (1) request a cautionary instruction when the trial court referred to jurors by badge numbers rather than names; (2) file a motion in limine at the start of trial to preclude any references to the victim as a "security guard," or object to the prosecution's references to such throughout trial and request a curative instruction; and (3) object to the prosecution's reference to the assistant store manager as being a "good guy" during closing argument.[16] As discussed above, however, Bishop has failed to show error with regard to the trial court's conduct during voir dire and with regard to any of his assignments of prosecutorial misconduct. Accordingly, Bishop's accompanying claims of ineffective assistance also fail. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120, 125 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").[17]

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Philip P. Mariani
/s/ Matthew S. Ackerman

---

[15] At the time of defendants' trial, MRE 611(d)(3) provided, in relevant part: "When a party calls a hostile witness, an adverse party or a witness identified with an adverse party, interrogation may be by leading questions."

[16] Bishop also asserts that the trial court erred by denying his request for a *Ginther* hearing on these points, but given that the existing record is sufficient to substantively address them, we see no need for such a hearing and no error in the trial court's refusal to hold one. See *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973); *People v Chapo*, 283 Mich App 360, 369; 770 NW2d 68 (2009).

[17] Bishop and Sharmel also raise cumulative-error arguments on appeal. For the reasons discussed above, we conclude that, at best, only one error potentially occurred, and any such error was harmless; accordingly, reversal on this basis is not warranted. See *Butsinas*, ___ Mich App at ___; slip op at 29.